**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CHRIS CRABTREE, *et al.*,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )　**CIVIL ACTION 11-0529-WS-B** |
| | ) |
| **VOLKERT, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 32) and Plaintiffs' Motion for Partial Summary Judgment (doc. 28). Both Motions have been exhaustively briefed and are now ripe for disposition.[1]

**I.      Nature of the Case.**

Plaintiffs, Chris Crabtree and Lloyd Everhardt, brought this action under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), against defendant, Volkert, Inc. In their

---

[1]      The Court notes that neither side's briefs comply with Local Rule 7.1(b). As to defendant's Motion for Summary Judgment, both principal briefs exceed the 30-page limit, with defendant's reply weighing in at nearly double the 15-page cap prescribed by Local Rule 7.1(b). The rule's restrictions are neither advisory nor aspirational; moreover, this is hardly the sort of hyper-technical, complex litigation that might warrant such overages. Neither plaintiffs nor defendant appear to have sought leave to exceed the limits fixed by Local Rule 7.1(b). Furthermore, neither Rule 56 Motion is accompanied by suggested determinations of undisputed fact and conclusions of law, or by the proposed order of judgment, as required by Local Rule 7.2(a). Also, while the parties have stuffed the record with nearly 1,000 pages of exhibits, the vast majority of these pages are not referenced or discussed even in passing in the memoranda. The Court will not independently examine uncited portions of the record in evaluating the parties' respective summary judgment arguments. *See* Rule 56(c), Fed.R.Civ.P. (parties must support their factual positions on summary judgment by "citing to particular parts of materials in the record" and the court "need consider only the cited materials"); *Williamson v. Clarke County Dep't of Human Resources*, 834 F. Supp.2d 1310, 1314 n.2 (S.D. Ala. 2011) ("The Court will not scour uncited portions of the summary judgment record for evidence that might bolster either side's arguments.").

Amended Complaint (doc. 4), plaintiffs allege that Volkert willfully violated the FLSA by (i) failing to pay them overtime compensation for hours worked in excess of 40 per workweek, and (ii) failing to maintain accurate records of plaintiffs' hours worked.  Volkert denies any such violation, arguing that Crabtree and Everhardt were exempt from the FLSA's overtime provisions pursuant to the Act's administrative exemption.  Plaintiff Crabtree also brings a separate FLSA retaliation cause of action, alleging that Volkert terminated his employment when he complained that he was being denied overtime compensation due under the FLSA.  Volkert's position is that it discharged Crabtree for legitimate business reasons unrelated to Crabtree's internal complaints concerning uncompensated overtime.

Following the close of discovery, the parties filed cross-motions for summary judgment. Volkert seeks an award of summary judgment on all claims and causes of action joined herein. Plaintiffs, by contrast, move for partial summary judgment, restricted to the issue of whether Volkert violated the salary basis of pay requirement for the FLSA's administrative exemption. (Doc. 38, at 1 n.1.)  Extensive briefing was conducted, after which this action was transferred to the docket of the undersigned.

## II.   Relevant Facts.[2]

---

[2]        For purposes of each of the competing motions, the Court construes the record, including all evidence and factual inferences, in the light most favorable to the non-movant.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Also, the Court rejects defendant's assertion that plaintiffs' exhibits appended to their response brief "are due to be stricken, or in the alternative, that they are manifestly inappropriate for inclusion in this Court's review of the record" because "[e]xhibits 'attached' to briefs ... are *not* part of the evidentiary record."  (Doc. 39, at 3-4.)  Nothing in the Federal Rules of Civil Procedure or the Local Rules of this District Court support defendant's belief that exhibits affixed to a brief cannot properly be considered on summary judgment.  Moreover, the longstanding practice in this District Court has been to accept summary judgment exhibits for consideration regardless of whether they are "attached" to a brief, presented via notice of filing, or appended to an attorney's declaration.  The Court will not strike exhibits in reliance on an imaginary procedural distinction that lacks reasonable grounding in federal or local practice or applicable law.  Defendant's citations to *In re DePugh*, 409 B.R. 84, 109-10 (Bankr. S.D. Tex. 2009) and *Miller v. McMann*, 89 F. Supp.2d 564, 569 n.5 (D.N.J. 2000) are unavailing.  *DePugh* concerned U.S. Bankruptcy Court procedures for exhibits that had not been presented at a hearing.  Of course, bankruptcy procedures are irrelevant to this matter, and there was no hearing in this case.  Meanwhile, *Miller* relied on a local rule in the District of New Jersey that treats briefs and affidavits differently for filing purposes.  That rule has no analog in this judicial district.  Besides, if *DePugh* and *Miller* did govern here, then the Court might be duty-bound to strike defendant's exhibits under the (Continued)

A.   *Defendant's Business and Plaintiffs' Job Duties.*[3]

Volkert is an engineering, planning and environmental consultation firm.  In this regard, Volkert performs certain consulting or contracting services for governmental agencies or departments on public works projects.  Volkert employed Crabtree as a Real Estate Specialist or Senior Real Estate Specialist from July 6, 2010 through September 2, 2011.  (Crabtree Decl. (doc. 37, Exh. L), ¶ 1.)[4]  Likewise, Volkert employed Everhardt as a Real Estate Specialist from

---

same reasoning, leaving an entirely barren summary judgment record and foreclosing any meaningful Rule 56 scrutiny.  Such a result would benefit no one.

[3]      Only Volkert has moved for summary judgment concerning the job duties portion of the test for the administrative exemption to the overtime provisions of the FLSA.  Accordingly, all record facts concerning plaintiffs' job duties are taken in the light most favorable to Crabtree and Everhardt for purposes of summary judgment, and all reasonable inferences from those facts are drawn in their favor.  This is so even though Volkert stridently disagrees with plaintiffs about their job duties and, especially, the extent to which they exercised discretion and independent judgment.

[4]      Defendant devotes no less than eight pages of its reply (doc. 39) to arguments that this Court should disregard plaintiffs' affidavits as attorney-drafted documents, self-serving statements, or outright shams.  (*See* doc. 39, at 5-12.)  These contentions are misguided.  Defendant's accusation that plaintiffs' counsel drafted Crabtree and Everhardt's Declarations is much ado about nothing.  Even if defendant's counsel had no involvement in preparing defendant's witnesses' summary judgment affidavits (a dubious proposition), the fact remains that neither the Federal Rules of Civil Procedure nor 28 U.S.C. § 1746 require a declarant to draft his own declaration in his own hand.  *See generally Sharpe v. Global Sec. Int'l*, 766 F. Supp.2d 1272, 1279-80 (S.D. Ala. 2011) (rejecting argument that § 1746 forbids use of typewritten or computer-generated declarations but instead requires declarant to write out enter declaration in own hand).  Nor is there any ban on declarations that serve a declarant's own interests.  To the extent that Volkert is inviting the Court to pass judgment on the quality of the evidence or to make credibility determinations on summary judgment, such actions are of course impermissible.  *See Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," on summary judgment).  Defendant's protest that the factual averments contained in these declarations are not "supported by any citation to record evidence" (doc. 39, at 6) overlooks the obvious point that the declarations, themselves, are record evidence.  Besides, it is black-letter law in this Circuit that "even in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment."  *Strickland*, 692 F.3d at 1160; *see also Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("we accept the nonmovant's version of the events when reviewing a decision on summary judgment").  Defendant's objection that the declarations contain hearsay is similarly misguided because whether the exhibits are or are not admissible as (Continued)

December 8, 2008 through August 1, 2011.  (Everhardt Decl. (doc. 37, Exh. M), ¶ 1.)  In broad-brush strokes, the duties of Crabtree and Everhardt "involved assisting agencies or departments in the acquisition of property for public work projects."  (Crabtree Decl., ¶ 2; Everhardt Decl., ¶ 2.)  As employees in Volkert's Real Estate Services Department, plaintiffs "assist[ed] the government agencies in complying with federal funding requirements relating to eminent domain that require public agencies to aquire [sic] real property fairly, expeditiously and cost effectively, and to ensure that displaced persons do not suffer disproportionate injuries as a result of the public works."  (Doc. 32, Exh. 21, at #9.)  Plaintiffs' work was "divided into two general areas of activity: 'acquisition' of subject properties and 'relocation' of displaced persons and businesses."  (Crabtree Decl., ¶ 6; Everhardt Decl., ¶ 4.)

---

presently submitted is of no moment.  Rule 56 does not forbid consideration of hearsay evidence, but only that evidence which cannot be presented at trial in admissible form.  *See, e.g., Prince Hotel, S.A. v. Blake Marine Group*, 2012 WL 4711897, *1 n.5 (S.D. Ala. Oct. 2, 2012) ("Even unauthenticated or otherwise inadmissible evidence is properly considered on summary judgment so long as it can be reduced to admissible form at trial."); Rule 56(c)(2), Fed.R.Civ.P. (explaining that proper objection is that "a fact cannot be presented in a form that would be admissible in evidence").  By all appearances, plaintiffs can shoulder that modest burden at trial.  And Volkert's invocation of the sham affidavit rule ignores that rule's narrowly circumscribed scope, and improperly seeks to extend it well beyond established boundaries to discrepancies that do not reach the level of direct, inherent contradictions.  *See, e.g., Croom v. Balkwill*, 645 F.3d 1240, 1253 n.18 (11th Cir. 2011) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.") (citation omitted); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case," and applies only where there is an "inherent inconsistency between an affidavit and a deposition") (citations omitted); *Akins v. Fulton County, Ga.*, 2008 WL 2130748, *3 (11th Cir. May 22, 2008) ("We apply the sham affidavit concept to limited circumstances, and thus, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence") (citation and internal marks omitted).  Many of the purported contradictions identified by Volkert result from tortured apples-to-oranges comparisons, strained readings of the declarations and deposition transcripts, and apparent confusion as to what plaintiffs' testimony actually was.  Without going through defendant's enumerated items one by one, it suffices to say that the "discrepancies" identified in defendant's brief do not "flatly contradict" plaintiffs' depositions in a manner that might justify application of the sham affidavit rule, but instead amount to mere variations that, at best, may give rise to credibility questions for a factfinder to weigh at trial.

Plaintiffs' evidence is that, in performing such relocation and acquisition functions, their day-to-day activities were guided by the Uniform Relocation Act ("URA") and accompanying manuals issued by Volkert's client agencies. (*Id.*) On the acquisition side, plaintiffs say, the URA and client manuals required the Real Estate Specialist "to complete a Fair Market Offer based on the property appraisal and to present this Fair Market Offer with the required paperwork to the displacee." (Crabtree Decl., ¶ 7; Everhardt Decl., ¶ 5.) In this regard, plaintiffs did not actually perform or assist in performing property appraisals, but instead received detailed appraisals in an already-completed state. (Crabtree Decl, ¶ 18; Everhardt Decl., ¶ 15.) Plaintiffs' role was to prepare a "Fair Market Offer" and present it to the property owner; however, plaintiffs "simply copied" that offer from the appraisal document, and lacked authority to deviate higher or lower than the amount specified in the appraisal. (Crabtree Decl., ¶ 19; Everhardt Decl., ¶ 16.) If the property owner rejected the Fair Market Offer, then plaintiffs' role in the negotiation ended, and they had no further involvement in recommending or implementing possible courses of action (*i.e.*, adjustment of offer, preparation of condemnation proceedings, involvement as an expert witness in litigation, etc.). (Crabtree Decl., ¶ 20; Everhardt Decl., ¶ 17.)

On the relocation side, plaintiffs' role was more pronounced. The URA and agency manuals require that (i) comparable housing be identified (for use in computing a replacement housing benefit), (ii) a replacement housing benefit be calculated for the displaced person, (iii) advisory assistance be provided to displaced individuals seeking replacement housing or other URA benefits, (iv) actual replacement housing selected by the displaced person be inspected to verify that it is "decent, safe and sanitary," and (v) appropriate paperwork be completed to transfer relocation benefits to the displaced person upon purchase or lease of replacement housing. (Crabtree Decl., ¶ 8; Everhardt Decl., ¶ 6.)

Crabtree contends that, for the most part, his work for Volkert in 2010 and 2011 was confined to providing "advisory assistance" to displaced individuals, inasmuch as the acquisition work, along with much of the relocation work (including identification of comparable housing and computation of relocation benefits), had already been completed. (Crabtree Decl., ¶ 14.) This "advisory assistance" consisted to a large degree of Crabtree providing transportation services by driving displaced renters (many of whom lacked vehicles or other means of private transport) to the Section 8 office or to appointments to view replacement housing. (*Id.*, ¶ 16.)

Also, a large part of Crabtree's relocation work consisted of "performing inventories of the personal property of displaced renters … by counting the number of rooms of furniture and looking on the schedule to determine the amount of the relocation benefit." (*Id.*, ¶ 17.) Crabtree concedes, however, that there were tracts for which he identified comparable housing and calculated replacement housing benefits. (*Id.*, ¶¶ 15, 22.) But even this work was largely routinized, as it consisted of merely compiling and sorting lists of comparable properties by square footage, number of bedrooms, etc. (*Id.*, ¶ 22.)[5] Looking at the "objective characteristics of the properties" on his lists, Crabtree contends, "it was usually obvious" what the most comparable property was, and if it was not, he "would bring the issue to the client's attention and ask the client what to do." (*Id.*, ¶ 25.) Also, Crabtree had no latitude in fixing replacement housing benefits, which were a simple arithmetic calculation of the difference between the appraised value of the acquired property and the listing price of the comparable property. (*Id.*, ¶ 26.) Occasionally, Crabtree would inspect the replacement property selected by the displaced owner to confirm that it was "decent, safe and sanitary" (a so-called "DSS inspection"); however, that process simply involved walking through the property and completing a preprinted form with standards and criteria supplied by the URA and the client. (*Id.*, ¶ 28.) Crabtree also performed required paperwork (called the "relocation package") for the client's approval after the displaced person bought or leased replacement housing; however, his completion of this paperwork was "micro-managed" by an outside consultant. (*Id.*, ¶¶ 29-30.) According to Crabtree, "[w]henever there was a discretionary decision to be made, I would ask the agency, Volkert's client, what it wanted to do, and I would follow the agency's discretion." (*Id.*, ¶ 38.) Everhardt's account of his job duties and responsibilities was functionally similar to Crabtree's in all material respects. (Everhardt Decl., ¶¶ 11-28, 36.)

B.     ***Defendant's Compensation Policies and Practices.***[6]

_____

[5]     For renters (who comprised the bulk of displaced persons whom he assisted), Crabtree would identify comparable properties "simply by conducting a room count and an occupant inventory," and matching up the properties to minimum HUD standards. (*Id.*, ¶ 23.)

[6]     Both parties have independently moved for summary judgment on plaintiffs' FLSA claims on the issue of whether Volkert can prove the salary basis of pay prong of the applicable test for the administrative exemption. As a technical matter, this means that, in evaluating each of the cross-motions, the Court must take the evidence in the light most favorable to the nonmovant. As a practical matter, however, this distinction is of little import (Continued)

When Volkert hired Everhardt and Crabtree in 2008 and 2010, respectively, Volkert officials completed hiring paperwork showing that each of them would be paid on an hourly basis. (Doc. 28, Exh. A, at 000799; Exh. B, at 001221.) Those same forms reflected that Everhardt would be compensated at an hourly rate of $30.00, and that Crabtree would be compensated at an hourly rate of $28.00. (*Id.*)[7] Despite these notations on hiring forms, since at least 1994 Volkert has considered Real Estate Specialists to be salaried employees. (Harmening Dep., at 48-50.) In that regard, it is undisputed that Volkert generally paid its Real Estate Specialists and Senior Real Estate Specialists a fixed, predetermined amount of compensation each week, regardless of the number of hours actually worked. It is likewise undisputed that Crabtree and Everhardt worked more than 40 hours in certain (perhaps even numerous) work weeks, and were not compensated for those endeavors with overtime premium pay of 1.5 times their regular rate.

Although plaintiffs were paid a fixed salary, on four occasions in 2010 and 2011 (August 6, 2010, September 17, 2010, December 10, 2010, and July 22, 2011), Volkert made deductions from Crabtree's paycheck for partial-day absences, or otherwise paid him in increments of fewer than 8 hours per workday. (Doc. 28, Exh. G, at 002665, 002669; Exh. F, at 000827, 000828.) Volkert's Human Resources Supervisor, Holly Gibney, testified that these kinds of partial-day deductions occurred for ostensibly salaried, exempt employees such as Crabtree on more than a dozen occasions between 2008 and 2011. (Gibney Dep., at 57-76.) None of these deductions involved plaintiff Everhardt. (Gibney Aff. (doc. 32, Exh. 12), at 2.) All told, the fraction of paychecks for Real Estate Specialists or Senior Real Estate Specialists during this period of time that included improper partial-day deductions was approximately 1%, with the total dollar amount of those erroneous deductions not exceeding $2,500. (*Id.* at 2-3.) Accordingly, partial-day deductions from the salaries of Real Estate Specialists and Senior Real Estate Specialists

---

here, inasmuch as the record reveals no significant disputed facts pertaining to the salary-basis-of-pay inquiry.

[7]    This treatment was similar to that of other Real Estate Specialists and Senior Real Estate Specialists hired by Volkert between 2007 and 2010. (Doc. 28, Exh. H.)

occurred only infrequently during the time period at issue, with minimal financial repercussions for the affected employees.

Notwithstanding the isolated incidence of this kind of event, the fact remains that partial-day deductions for salaried employees constituted a violation of Volkert's written policies.  In particular, Volkert's Personnel Practices Manual (doc. 33, Exh. 7) provided at all relevant times that "[n]on-mandated deductions from pay for salaried employees exempt from the overtime requirements of the [FLSA] are prohibited" except in certain enumerated circumstances.  (Doc. 28, Exh. J, at 000420.)  Two of those exceptions were "[f]or *full-day absences* for personal reasons" or "[f]or *full-day absences* for sickness or disability or intermittent leave under the" FMLA.  (*Id.* (emphasis added).)  Volkert expected its department managers to enforce the salary-deductions policy, including the prohibition on partial-day deductions for salaried, exempt employees.  (Gibney Dep., at 29.)  In Crabtree and Everhardt's department, that responsibility rested with Sandy Harmening, manager of Volkert's Real Estate Services Department (also called the "Right-of-Way Department").  (Harmening Dep., at 25-26, 34.)

The record leaves no doubt that, for some time, Harmening misunderstood and misapplied Volkert's policy forbidding partial-day salary deductions.[8]  She was the Volkert manager responsible for approving those deductions for Crabtree and other Real Estate Services employees during the relevant period.  (Gibney Dep., at 29.)  Human Resources Supervisor Gibney became aware of Harmening's errors in this regard when Crabtree questioned in the summer of 2011 whether he was hourly or salaried.  (*Id.* at 29-31.)  Gibney "was very surprised to find that [Harmening] did not understand the way that she was supposed to be approving the time card," and spoke with Harmening to convey to her "a better understanding" of Volkert policy on this front.  (*Id.* at 30.)[9]  As of her May 2012 deposition in this case, Harmening

---

[8]         In her deposition, Harmening candidly admitted as much, testifying, "Well, I was -- I tried to dock myself a half a day, and I found out I could not do that.  So, I did not have a clear understanding. … I had a misunderstanding of that [prohibition on partial-day deductions for salaried, exempt employees]."  (Harmening Dep., at 42.)

[9]         Unfortunately, the lesson did not appear to take, as the record shows that Harmening was still attempting to take improper partial-day deductions for salaried, exempt employees as recently as February or March 2012.  (Harmening Dep., at 42-44; Gibney Dep., at 30.)  Harmening admitted that the first time she had a "clear understanding" of the rule was two to three months before her May 2012 deposition.  (Harmening Dep., at 43-44.)

expressed a clear, accurate understanding of Volkert's salary-deduction policy, testifying that "[a] salaried employee is going to get paid 40 hours a week, no matter what," even if the employee has partial-day absences that cause actual hours worked in a given week to dip below the 40-hour threshold. (Harmening Dep., at 72.) Also, Gibney identified certain additional procedural safeguards (payroll reports, alerts, checklists, new system, etc.) that Volkert implemented in 2011 to prevent these kinds of improper salary deductions from occurring. (Gibney Aff., at 22-27.) There is no record evidence that such safeguards have been ineffectual or that improper deductions continued following implementation of those safeguards; to the contrary, those safeguards caught and prevented at least one Harmening error thereafter.

Approximately a year after learning of these improper partial-day deductions that Harmening had approved for ostensibly salaried, exempt employees, Volkert reimbursed all affected employees the full amounts of those deductions. (Gibney Aff., at 2 & Exh. A.) In particular, defendant's evidence shows that, on or about June 22, 2012, it sent checks to Kiley Hill in the amount of $1,300.00; to Crabtree in the amount of $448.00; to Thomas Dane in the amount of $466.40; and to Todd Donze in the amount of $138.00, all to compensate them in full for improper partial-day deductions that had occurred between 2008 and 2011.[10]

### C. Plaintiff Crabtree's Protected Activity and Ensuing Termination.[11]

On or about June 30, 2011, Crabtree met with Gibney (the Human Resources Supervisor), and inquired as to whether he was an hourly or a salaried employee. (Gibney Dep., at 35, 42.) Gibney replied that she would have to investigate the matter, but that she understood right-of-way employees to be salaried. (*Id.* at 37-38.) The following morning, July 1, 2011, Crabtree sent Gibney an e-mail message stating, "I would like to register a formal complaint

---

[10]    Interestingly (and perhaps not coincidentally), Volkert mailed out these reimbursement checks on the same day that Crabtree and Everhardt filed their Motion for Summary Judgment, in which they asserted that they did not qualify for the administrative exemption because Volkert did not satisfy the salary basis of pay requirement. A significant component of plaintiffs' argument was that Volkert did not qualify for the so-called "window of correction" under the FLSA because it had failed to reimburse employees for improper deductions.

[11]    Volkert alone has moved for summary judgment on Crabtree's FLSA retaliation cause of action. Accordingly, for summary judgment purposes, all evidence and reasonable inferences relating to that cause of action are construed in Crabtree's favor.

against Patrick Anthony, my supervisor."  (Doc. 37, Exh. O, at P102.)  Crabtree went on to explain that, because he was being required to travel from Mobile to New Orleans for work three days per week, and to remain in New Orleans from 8 a.m. until 5 p.m. on those days, Crabtree was working "15 overtime hours per week ….  So my estimation was 15 hrs overtime per week minus 8 hours off on Friday equals +7 hours accumulated per week." (*Id.*)  The email concluded with Crabtree stating, "I can furnish my personal logged overtime hours on request if needed." (*Id.*)

A series of meetings ensued, with Volkert officials Gibney, Sandy Harmening (Crabtree's department manager), and David Bell (a Volkert vice president) conferring with Crabtree at various times in July and August 2011.  (Gibney Dep., at 79, 86.)  On or about August 11, Bell notified Crabtree "that he was a salaried employee, that he had been treated as a salaried employee, that [Bell] felt a mistake had been made if he had been termed as hourly." (*Id.* at 86.)  On August 23, 2011, Crabtree sent Gibney another e-mail message, the body of which read as follows:  "I have been thinking about our three meetings regarding my overtime worked in New Orleans.  I feel not paying my overtime is illegal and I would like to know if this is Volkerts [*sic*] final answer."  (Doc. 37, Exh. O, at 000453.)  Gibney shared and discussed Crabtree's August 23 e-mail with Harmening and Bell.  (Bell Dep., at 134; Harmening Dep., at 175.)  The following day, Harmening sent a memorandum to Crabtree, confirming Volkert's position that "[y]ou are classified as a Senior Real Estate Specialist and considered a professional employee exempt from overtime."  (Doc. 37, Exh. R.)

No more than one week after Crabtree complained in writing that Volkert's refusal to pay him overtime was "illegal," defendant decided to terminate his employment.  On August 30, 2011, Harmening authored an internal memorandum identifying Crabtree as one of four employees being let go.  (Doc. 37, Exh. T.)  The memo explained that Crabtree had been hired for a specific job (the LSU/VA project), that this project "is at a close and based on our work load, staff seniority, and client relationships we have no other choice but to lay Chris [Crabtree] off."  (*Id.*)  Harmening's memo concluded that "the LSU/VA project is closing down," that Crabtree had been "hired in 2010 for this project," and that Volkert's "current workload does not justify retaining" him.  (*Id.*)

On September 2, 2011, Bell sent a letter to Crabtree notifying him that Volkert "has not been able to maintain a sufficient backlog of work for the Real Estate Services Department.  Due

to this lack of work, it is necessary to reduce the work force to accommodate the amount of work available.  Therefore, your last day of employment with Volkert, Inc. will be September 2, 2011."  (Doc. 32, Exh. 13.)  Crabtree's employment was indeed terminated effective September 2, 2011, just 10 days after he sent the e-mail to Volkert officials complaining that "I feel not paying my overtime is illegal."

## III.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

Although defendant alone moved for summary judgment as to Crabtree's FLSA retaliation claim and the duties-test portion of plaintiffs' FLSA overtime claim, both sides moved for summary judgment as to the salary-basis-test portion of plaintiffs' FLSA overtime claim. The law is clear that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same).  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment

unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11ᵗʰ Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8ᵗʰ Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307.

**IV.   Whether Plaintiffs Were Exempt from the FLSA's Overtime Pay Requirements.**

　　**A.   *Legal Test for Administrative Exemption.***

　　As a general rule, the Fair Labor Standards Act requires employers to pay their employees overtime pay of one and one-half times their regular rate for all hours worked in excess of 40 in a particular workweek.  *See* 29 U.S.C. § 207(a)(1).  Here, it is undisputed that Volkert failed to compensate Crabtree and Everhardt at one and one-half times their regular rate for their weekly hours worked in excess of 40.  However, the Act also creates certain exemptions from those overtime pay requirements.  The exemption invoked by Volkert in this case applies to "any employee employed in a bona fide executive, administrative, or professional capacity" who is compensated on a salary basis.  29 U.S.C. § 213(a)(1).  Volkert contends that both Crabtree and Everhardt qualified for the administrative exemption, such that it owes them no overtime premium pay for the time period at issue.

　　"The Department of Labor's (DOL) regulations set forth the requirements for the administrative exemption.  Both a 'salary basis' test and a 'duties' test must be satisfied." *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11ᵗʰ Cir. 2004); *see also Davis v. City of Hollywood*, 120 F.3d 1178, 1179 (11ᵗʰ Cir. 1997) (to be eligible for the administrative exemption, "an employer must prove that the relevant employees meet two tests: the job duties test and the salary basis test").  In applying these tests, the Court is cognizant that "[t]he employer carries the burden of proving the exemption, and we narrowly construe the overtime provisions of Section 207 against the employer." *Hogan*, 361 F.3d at 625; *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11ᵗʰ Cir. 1997) ("Exemptions under the FLSA, however, are to be construed narrowly. …

Indeed, the employer has the burden of showing that it is entitled to the exemption.") (citations omitted).

**B.      *Duties Test.***

The applicable FLSA duties test contemplates that for an employee whose weekly salary exceeds $455 (as both plaintiffs' did at all relevant times), the administrative exemption applies only if both of the following requirements are satisfied: (i) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (ii) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2)-(3); *see also Rock v. Ray Anthony Int'l, LLC*, 2010 WL 2089636, *2 (11th Cir. May 26, 2010) (reciting elements of duties test).  The parties disagree as to whether either (much less both) of these elements is satisfied here.  To resolve defendant's Rule 56 Motion as to the duties test, however, the Court looks no further than the "discretion and independent judgment" prong.[12]

---

[12]      The Court need not (and therefore does not) decide whether Crabtree's and Everhardt's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2).  Nonetheless, the Court pauses to observe that plaintiffs' insistence that they were mere "production workers" appears legally threadbare and factually incorrect.  Certainly, plaintiffs are right that "the essence of [this] prong's focus on 'general business operations' is to separate production from administration. … Production work relates to the goods and services that the business contributes to the marketplace, whereas administration relates to running the business."  *Rock*, 2010 WL 2089636, at *3 (citing Department of Labor guidance dated March 24, 2010).  To qualify for this exemption, the employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  However, the regulations also specify that "[w]ork related to management or general business operations" includes work in functional areas such as "purchasing," "procurement," "public relations, government relations," and "legal and regulatory compliance."  29 C.F.R. § 541.201(b).  Nor must the focus be on the employer's business; rather, "[a]n employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations *of the employer's customers.*"  29 C.F.R. § 541.201(c) (emphasis added).

At its core, the primary duty of Real Estate Specialists at Volkert appears to be assisting Volkert clients during the eminent domain process with respect to acquisition of parcels and relocation of property owners.  This is not reasonably couched as "production work."  Volkert's clients (such as the Lousiana Department of Transportation ("LDOT"), for example) are not in (Continued)

-13-

There is no doubt that "[t]o qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.202(a).  The regulations emphasize that this is a highly fact-bound inquiry.  *See* 29 C.F.R. § 541.202(b) (explaining that "discretion and independent judgment" must be evaluated "in the light of all the facts involved in the particular employment situation in which the question arises," and reciting lengthy list of relevant factors).  Three noteworthy clarifications of the "discretion and independent judgment" concept are (i) that the term "implies that the employee has authority to make an independent choice, free from immediate direction or supervision;" (ii) that the term excludes the performance of "mechanical, repetitive, recurrent or routine work;" and (iii) that the employee's primary duty "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."  29 C.F.R. § 541.202(c), (e).

To hear Crabtree and Everhardt describe it, their primary job duties involved implementation of highly standardized, routinized, even rote tasks that were largely mechanical,

---

the relocation business; rather, they are in the business of building roads and other infrastructure projects.  To enable it to perform that "production" work, LDOT hires Volkert to provide services in the administrative/ management/ general business operation functions of procurement (of real estate, not office supplies), legal/regulatory compliance, public relations, and so on to ensure that the eminent domain process (which itself ancillary to the public-works construction that is LDOT's business) complies with federal funding requirements.  In other words, Crabtree and Everhardt helped LDOT run its business by making sure that property acquisition and relocation functions were performed in a lawful and proper manner, so that LDOT could go forward with the production work of building roads on the acquired parcels.  Viewed in this light, plaintiffs' characterization of Real Estate Specialists such as Crabtree and Everhardt as mere production workers appears unwarranted and inaccurate.  *See generally* Opinion Letter Fair Labor Standards Act FLSA2006-23, 2006 WL 2158424 (June 29, 2006) (where the employer "is a land-acquisition service that assists government agencies in the acquisition of property for public works projects," opining that relocation agents who "assist in property appraisal and provide relocation assistance to the owners and tenants of the property purchased by" their employer's clients are performing work that "is directly related to the general business operations of the employer's clients" because they "work in the functional areas of procurement, government relations, and legal and regulatory compliance, which are management and general business operations functions," such that they satisfy this prong of the duties test for the administrative exemption).  Thus, it appears highly unlikely that plaintiffs can prevail at trial in arguing that their primary duties were not work related to management or general business operations of Volkert or its customers.

repetitive and recurrent, at most involving use of skill in applying well-established standards set forth in the URA and client manuals.  Crabtree describes the bulk of his day-to-day activities as transporting displaced renters to various appointments, preparing inventories of personal property, and so on.  Crabtree avers that he spent little time identifying comparable properties and calculating replacement housing benefits, and even then casts those activities as standardized, routine procedures in which he had no latitude or discretion beyond doing what was "obvious."  And while Crabtree did perform DSS inspections from time to time, he frames those inspections as consisting of simply walking through a property and filling out a pre-printed checklist to ensure the new housing's compliance with the Uniform Relocation Act and the client's own minimum standards.  Whenever Crabtree faced any kind of unusual or non-obvious situation, he avers, he did not decide what to do himself, but instead always went to the client for instructions.  Everhardt's description of his duties is much the same.  Accepting these descriptions of plaintiffs' job duties as accurate, as the Court must on summary judgment, a reasonable factfinder could readily conclude that plaintiffs' primary duties did not include the exercise of discretion and independent judgment with respect to matters of significance.  Plaintiffs' evidence is that they lacked authority to make independent choices, free from immediate direction and supervision; and that the tasks they performed were standardized, mechanical and routine, at most involving skill in applying specific standards from the URA and client manuals to a particular situation.  In the absence of such discretion, of course, plaintiffs would be ineligible for the administrative exemption to FLSA overtime requirements.[13]

---

[13]     The Court understands, of course, that Volkert has a sharply differing view of what Real Estate Specialists such as Crabtree and Everhardt actually do and how much authority they have.  For example, Volkert says that Real Estate Specialists perform certain duties (*i.e.*, serving as expert witnesses in administrative appeals or litigation, assisting property owner in preparing for property closing) that Crabtree and Everhardt deny was part of their job.  Similarly, Volkert insists that it and its clients "rel[y] heavily upon professional judgment of the Real Estate Specialist serving as a relocation agent" (doc. 32, Exh. 21, at #9), but plaintiffs' evidence is otherwise.  And Volkert maintains that its Real Estate Specialists have "[g]reat latitude" in the "judgment call" of identifying comparable properties (*id.*), which plaintiffs flatly deny.  If Volkert's version of the facts is correct, then the "discretion and independent judgment" prong may well be satisfied; however, plaintiffs' evidence (not defendant's) governs the Rule 56 inquiry as to defendant's motion.  Summary judgment is neither the time nor the place for courts to resolve credibility disputes and embark on fact-finding expeditions.  Likewise, the Court finds unpersuasive defendant's arguments in its reply that various pieces of evidence prove the (Continued)

The Court's conclusions in this regard were echoed very recently in what appears to be a factually identical case pending in the Northern District of Alabama. Just over two weeks ago, summary judgment was denied in *Brazil v. Volkert, Inc.*, 2012 WL 5872812 (N.D. Ala. Nov. 19, 2012). The *Brazil* case involves a former colleague of Crabtree's and Everhardt's who worked for Volkert in the same job classification with the same job title for the same manager in the same time period at issue in this case.[14] Given that our plaintiffs' FLSA overtime claims are apparently in an identical factual and legal posture to Brazil's FLSA overtime claims, the *Brazil* court's analysis of the duties test in Volkert's summary judgment motion concerning the administrative exemption provides helpful guidance to the undersigned in confronting precisely the same issue here. That court concluded as follows: "Because genuine, and hotly contested, issues of material fact exist as to the extent of Mr. Brazil's independent judgment and discretion as a Real Estate Specialist when viewing the evidence in the light most favorable to the nonmovant, the court cannot grant summary judgment for Volkert under the Administrative Exemption." *Id.* at *9.

For all of the foregoing reasons, the Court finds that there are genuine issues of material fact as to whether plaintiffs' primary duty included the exercise of discretion and independent judgment with respect to matters of significance, as required by 29 C.F.R. § 541.202(a). Those factual disputes preclude entry of summary judgment in Volkert's favor on the "duties test"

---

existence of the requisite discretion and independent judgment. (Doc. 39, at 18.) For example, Volkert maintains that Crabtree admitted to deviating from URA criteria in DSS inspections; however, the cited record testimony is, at best, ambiguous (and, at worst, unsupportive) of that point. Volkert insists that plaintiffs "repeatedly gave their *certified opinions* regarding the Fair Market Value" of various properties, but ignores plaintiffs' evidence that they simply copied that information from an appraisal and lacked authority to do otherwise. And, contrary to Volkert's suggestion, the fact that Everhardt was assigned a "runner" for some period of time does not automatically imply that his primary duty involved exercise of independent judgment and discretion in matters of significance; indeed, it seems difficult to imagine how directing a single low-level employee's activities could possibly qualify as a "matter of significance" to the company. (There is no defense presented here that Everhardt was subject to the executive exemption, which at any rate applies only to an employee "[w]ho customarily and regularly directs the work of *two or more other employees*." 29 C.F.R. § 541.100(a)(3) (emphasis added.)

[14]     Coincidentally, Mr. Brazil is represented by the same attorneys who represent Messrs. Crabtree and Everhardt here, and Volkert's counsel is likewise identical in both actions.

portion of the FLSA's requirements for the administrative exemption.  Accordingly, defendant's Motion for Summary Judgment is **denied** on this point.

> **C.      *Salary Basis Test.***

For an employee to qualify for the administrative exemption, "[t]he regulations provide … that … an employee must be paid on a salary basis."  *Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1340 (11th Cir. 1994).  "An employee is considered 'paid on a salary basis' if 'he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  *Hogan*, 361 F.3d at 625 (citations and internal quotation marks omitted); *see also Davis*, 120 F.3d at 1179 (similar); *Friedman v. South Florida Psychiatric Associates, Inc.*, 2005 WL 1540129, *1 (11th Cir. July 1, 2005) ("One of the requirements for exempt status is that the employee be paid on a salary basis, which requires the employee's compensation not be subject to reduction because of variations in the quality or quantity of the work performed.") (citation and internal quotation marks omitted).  The salary basis of pay is lacking for employees whose "employers have reduced their salaries because of how much or how well they worked."  *Nicholson v. World Business Network, Inc.*, 105 F.3d 1361, 1365 (11th Cir. 1997).

"A deduction for a partial day's absence is not one of the allowable deductions."  *Friedman*, 2005 WL 1540129, at *2 (where plaintiff's pay was docked for partial-day absences, "the salary basis of pay was violated, and Friedman was rendered a non-exempt employee and was entitled to overtime").  The uncontroverted evidence is that Crabtree and several other Real Estate Specialists incurred deductions from their salary for partial-day absences, with the incidence of such deductions being approximately 17 occasions over a four-year period. Plaintiffs' argument, quite simply, is that those deductions irrevocably destroyed the salary basis of pay for all Real Estate Specialists and Senior Real Estate Specialists reporting to manager Harmening during the entire time period of concern, and foreclose Volkert from relying on the administrative exemption to defeat plaintiffs' FLSA overtime claims.[15]  *See* 29 C.F.R. §

---

[15]      Although plaintiff Crabtree's pay was reduced on occasion because of partial-day absences, no such deductions were ever made to plaintiff Everhardt's salary.  Nonetheless, both case law and regulations confirm that if the salary basis of pay test was not satisfied for Crabtree, then it was likewise not satisfied for his co-workers in the same job classification working for the (Continued)

541.603(a) ("An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis.").

In response, Volkert invokes the "window of correction" mechanism established by the regulations. *See, e.g., Davis*, 120 F.3d at 1180 (recognizing a regulatory "window of correction" that preserves the salary basis of pay in certain circumstances, such that "the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future"). The "window of correction" regulation was substantially and materially revised by the Department of Labor in 2004. This development is important, because the vast majority of the authorities cited in the parties' briefs pre-dates the 2004 amendments. Rather than parsing the language of case law applying a superseded iteration of the regulation, the Court focuses on the operative regulatory language itself.[16]

Two different subsections of 29 C.F.R. § 541.603 confirm that the salary basis of pay was not destroyed for Crabtree and Everhardt by the infrequent partial-day absence deductions appearing in the record. First, subsection (c) provides that "[i]mproper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions."

---

same manager. *See, e.g., Avery*, 24 F.3d at 1342 (rejecting defendant's argument that "our holding that Lt. Jacks is not a salaried employee would not affect the salaried status of the other lieutenants," and instead clarifying that "[w]e hold that the suspension of Lt. Jacks destroyed not only his salaried status but that of the other lieutenants as well"); 29 C.F.R. § 541.603(b) ("If the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions."). Crabtree and Everhardt worked in the same job classification for the same manager. Accordingly, the salary-basis analysis is identical for each plaintiff's FLSA overtime claims, notwithstanding their divergent experiences in terms of actual partial-day deductions from salary.

[16]    In so doing, the Court recognizes that "[t]he FLSA grants the Secretary broad authority to define and delimit the scope of the exemption for executive, administrative, and professional employees." *Auer v. Robbins*, 519 U.S. 452, 456, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations and internal markings omitted); *see also Avery*, 24 F.3d at 1340 (DOL's interpretive regulations defining scope of FLSA's § 213 exemptions "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute") (citation omitted).

29 C.F.R. § 541.603(c).  The partial-day absence deductions that Harmening approved for approximately 1% of the paychecks issued to Real Estate Specialists and Senior Real Estate Specialists during the 2008-2011 period qualify as "isolated" under any reasonable definition of the term.  These kinds of errors were happening roughly four times per year during the relevant time period.  (Gibney Aff., at Exh. A.)  These undisputed facts reflect that the improper deductions were "isolated" for purposes of § 541.603(c), and plaintiffs have advanced no meaningful argument to the contrary.  Moreover, the record is clear that Volkert ultimately reimbursed employees for each of those sporadic, isolated improper deductions.[17]  For these reasons, the salary basis of pay remains intact for Crabtree and Everhardt, despite the partial-day absence deductions that occurred, pursuant to the plain language of § 541.603(c).

The same conclusion attaches under subsection (d) of the same regulation.  That provision reads in part as follows: "If an employer has a clearly communicated policy that

---

[17]    Plaintiffs insist that Volkert should not get credit for reimbursing the affected employees because it failed to do so until June 2012, after this lawsuit was filed and, indeed, while summary judgment briefing was underway.  The trouble with plaintiffs' argument is that neither § 541.603 nor the predecessor regulation established any time frame within which the reimbursement must take place in order for an employer to avail itself of the window of correction.  Courts have routinely rejected arguments comparable to plaintiffs' in analogous factual and procedural circumstances involving improper FLSA deductions.  *See, e.g., Auer*, 519 U.S. at 463-64 (with respect to predecessor regulation, declining to hold that "reimbursement must be made immediately upon the discovery that an improper deduction was made," where the regulation itself "does not address the timing of reimbursement" and the Secretary indicated via *amicus* brief that "he does not interpret it to require immediate payment"); *Davis*, 120 F.3d at 1180 (where employer conducted audit during pendency of FLSA litigation and reimbursed employees found to have been subject to improper deductions, "no question exists that under the facts of this case the City comes within the protection of the window of correction"); *Kelly v. City of New York*, 2000 WL 1154062, *27 (S.D.N.Y. Aug. 15, 2000) (finding that window of correction remained available, even though employer still had not reimbursed plaintiffs for improper deductions at time of summary judgment ruling, where "the language of the regulation does not address the timing of reimbursement and the Secretary of Labor does not interpret the regulation to require immediate payment upon discovery of the improper deduction"); *Johnson v. Chicago Housing Authority*, 1997 WL 757737, *5 (N.D. Ill. Nov. 24, 1997) ("CHA's promise to reimburse plaintiffs upon a final judgment that it can avail itself of the Window of Correction rule satisfies the standard set forth in *Auer*.") (internal marks omitted).  Although these cases were decided under the pre-2004 iteration of the "window of correction" regulation, nothing in the present version (§ 541.603(c),(d)) suggests that the DOL intended to impose any kind of deadline on the timing of reimbursement as a prerequisite for an employer to avail itself of the window of correction.

prohibits the improper pay deductions specified in § 541.602(a) and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees unless the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints."  29 C.F.R. § 541.603(d).  Thus, subsection (d) creates a safe harbor when the following five criteria are satisfied: (i) the employer has a clearly communicated policy prohibiting improper deductions; (ii) that policy includes a complaint mechanism; (iii) the employer reimburses employees for any improper deductions; (iv) the employer makes a good faith commitment to comply in the future; and (v) the employer does not continue to make improper deductions after receiving employee complaints.

All five of those criteria are present here.  First, it is undisputed that Volkert's Personnel Practices Manual distributed to all employees prohibited deductions to the salary of exempt employees for partial-day absences.  (Doc. 32, Exh. 7, at 000420.)[18]  Second, that policy plainly included a complaint mechanism, as it directed any salaried employee "who believes that an improper deduction has been made from his/her pay [to] utilize the 'Problem Solving' procedures in Section II(K) of this Manual to resolve the matter."  (*Id.*)  Third, as discussed *supra*, Volkert fully reimbursed employees for improper deductions.  Fourth, the record unambiguously shows that Volkert made "a good faith commitment to comply in the future" in the form of implementing additional procedural safeguards to prevent improper deductions, as well as one-on-one discussions in which Gilbey educated Harmening about Volkert's salary deduction policies and instructed her on the proper application of same.  Fifth, the record is devoid of evidence that Volkert "willfully violate[d] the policy by continuing to make improper deductions after receiving employee complaints."  § 541.603(d).[19]  Accordingly, the subsection

---

[18]    According to the regulation, "[t]he best evidence of a clearly communicated policy is a written policy that was distributed to employees prior to the improper pay deductions by, for example, … publishing the policy in an employee handbook."  29 C.F.R. § 541.603(d).  That was done here, inasmuch as the deductions policy was included in Volkert's Personnel Practices Manual; therefore, the "clearly communicated policy" requirement is satisfied.

[19]    Plaintiffs vigorously pursue this prong of subsection (d), pointing to the July 22, 2011 deduction as proof that "Assistant VP Harmening made at least one improper deduction even after HR Supervisor Gibney informed her she could not do so."  (Doc. 38, at 3.)  However, plaintiffs' argument glosses over the language in the regulation that continuing to make improper (Continued)

(d) safe harbor is likewise satisfied here, and the salary basis requirement for FLSA exemption purposes remains intact as to plaintiffs, notwithstanding Volkert's infrequent, improper partial-day deductions from salary.

One other issue concerning the salary basis test is properly addressed at this time. Without citing regulatory language, plaintiffs rely on pre-2004 authorities interpreting the predecessor regulation for the proposition that an employer's intent to pay employees on a salaried basis is a prerequisite to eligibility for the window of correction.[20]  The "intent" concept surfaces in subsection (a) of the current regulation, which provides that "[a]n employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis."  29 C.F.R. § 541.603(a). Unfortunately, the parties fail to address in any meaningful way (either by discussion or citation to post-2004 authorities) the interplay between subsection (a) (which says the exemption is lost if the employer did not intend to pay its employees on a salary basis) and subsections (c) and (d) (which say the exemption is not lost if certain corrective actions are taken).  Is subsection (a) a prerequisite that must be satisfied before subsections (c) and (d) become available?  Or do

---

deductions destroys the safe harbor only if such action occurs "after receiving employee complaints."  § 541.603(d).  There is no evidence that any Volkert employee complained prior to July 22, 2011 about improper partial-day deductions.  Certainly, Crabtree had expressed concerns about FLSA issues prior to that date; however, his objections were directed generally at hourly versus salaried status and specifically at the scheduled overtime his supervisor was making him work.  There is no evidence that he balked at particular deductions for partial-day absences, or that he ever told Volkert he believed those deductions were improper under the FLSA and/or Volkert policy.  The record lacking any factual basis to support an inference that Volkert continued to make improper deductions after receiving employee complaints about said deductions, no reasonable factfinder could conclude that this prong of the subsection (d) safe harbor is absent in this case.  Plaintiffs' attempt to rewrite the regulation as eliminating access to the window of correction where the employer "continu[es] to make improper deductions after learning that the deductions were improper" (doc. 38, at 5 (emphasis added)) is ill-conceived and unpersuasive.  The actual text of the regulation does not hinge window-of-correction status on whether the employer made deductions after "learning that the deductions were improper."

[20]        In that regard, plaintiffs urge the Court to follow a Sixth Circuit opinion dating back to 2001 and concluding that, "when read in its entirety, the 'window of correction' regulation allows use of the defense only after an employer has first demonstrated an intention to pay its employees on a salary basis."  *Takacs v. Hahn Automotive Corp.*, 246 F.3d 776, 783 (6th Cir. 2001).

subsections (c) and (d) effectively restore an exemption that would otherwise be lost by subsection (a)?  Lacking the benefit of research or legal arguments by the parties on this issue, the Court will not forge ahead *sua sponte* to construe the interaction among these subsections.

Instead, the Court will assume (without deciding) that subsection (a) is indeed a preliminary hurdle that an employer must overcome before it may unlock the window of correction defense in subsections (c) and (d).  Subsection (a) states that the intent inquiry turns on whether "an employer has an actual practice of making improper deductions." § 541.603(a).  In determining whether an "actual practice" exists, courts must consider factors such as (i) the number of improper deductions, relative to the number of infractions; (ii) the time period in which improper deductions were made; (iii) the number and geographic location of employees whose salaries were improperly reduced; (iv) the number and geographic location of managers who took the deductions; and (v) whether the employer has a clearly communicated policy prohibiting improper deductions.  *Id.*  Applying these factors, and otherwise examining the totality of the circumstances, the Court is convinced that no reasonable factfinder could conclude that Volkert had an "actual practice" of making improper deductions for purposes of § 541.603(a).  In so concluding, the Court observes that Volkert at all times had a clearly communicated written policy prohibiting improper deductions; that the deductions in question were made infrequently by a single manager (Harmening) who by her own admission did not understand the policy; that Volkert officials took prompt steps to educate Harmening, correct her errors, and prevent future errors when they became aware of same; and that only four (4) employees in the entire Volkert organization ever had their salaries reduced between 2008 and 2011 for partial-day absences.  There is no evidence that any other Volkert manager at any time in any location misapplied the salary-deduction policy in the manner that Harmening did, or that any other Volkert employee was subjected to improper deductions at any time.  Simply put, the facts do <u>not</u> demonstrate that the "employer had an actual practice of making improper deductions." 29 C.F.R. § 541.603(a).  As such, by operation of subsection (a), the facts do not "demonstrate that the employer did not intend to pay employees on a salary basis," and Volkert does not lose the exemption.  *Id.*[21]

---

[21]      In so concluding, the undersigned notes that plaintiffs' briefs shift the focus from Volkert's intent and actual practice to those of Harmening.  (*See, e.g.*, doc. 28, at 20-21 (Continued)

For all of the foregoing reasons, the Court concludes that there are no genuine issues of material fact, and that Volkert has satisfied the salary basis test for the administrative exemption for both Crabtree and Everhardt.  Although improper deductions were made, when the facts are accepted in the light most favorable to plaintiffs, Volkert retained the salary basis of pay pursuant to 29 C.F.R. § 541.603(c) and (d) because it had no actual practice of making improper deductions, the improper deductions were isolated, Volkert had a clearly communicated policy prohibiting such deductions and providing for a complaint mechanism, all affected employees were reimbursed for improper deductions, Volkert made a good faith commitment to comply in the future, and Volkert did not continue making improper deductions after receiving employee complaints.  With regard to the salary basis test, then, Volkert's Motion for Summary Judgment (doc. 32) is **granted**, and plaintiffs' Motion for Partial Summary Judgment (doc. 28) is **denied**.

---

(discussing "her 'actual practice' of making unlawful deductions") & 22 ("Sandy Harmening's testimony establishes unequivocally that she did not intend to pay employees on a salary basis"); doc. 38, at 4 (referring to "her 'actual practice' of making unlawful deductions"), 6 (arguing that "what matters is … the intent of the manager who makes the deductions"), & 7 (insisting that Harmening "had an 'actual practice' of intentionally deducting for partial day absences").)  Plaintiffs do not identify any language in subsection (a) or ensuing case law that would make the individual manager (rather than the employer) the proper unit of observation for the "actual practice" inquiry.  To the contrary, the plain language of the regulation shows otherwise.  Subsection (a) provides that the exemption is lost if "the **employer** did not intend to pay employees on a salary basis," not the manager.  § 541.603(a) (emphasis added).  The regulation continues that the proper determination is "whether an **employer** has an actual practice of making improper deductions," not the manager.  *Id.* (emphasis added).  This unambiguous language is buttressed by subsection (a)'s recitation of a proper factor in the inquiry as being "the number and geographic location of managers responsible for taking the improper deductions." *Id.*  If, as Crabtree and Everhardt insist, a single manager's misunderstanding is automatically dispositive of the employer's intent for subsection (a) purposes, surely the regulation would not have specified that the number of managers making improper deductions was a relevant factor.  By wording the regulation as it did, the DOL is acknowledging that the outcome of the "actual practice" inquiry differs where a single rogue manager imposes improper deductions, versus where myriad managers are doing so.  The latter circumstance would obviously be far more probative of an employer's actual practice of making unlawful deductions than would the former.  For all of these reasons, the Court cannot accept plaintiffs' contention that Harmening's "actual practice" is all that matters for the § 541.603 inquiry; rather, the clear language of that regulation specifies that it is the employer's actual practice (not that of a single misinformed, confused, or even malicious/rogue manager) that is relevant.  Plaintiffs have not argued – and cannot reasonably argue on this record – that Volkert as a whole ever had an "actual practice" of making the unlawful deductions at issue.

## V.   Plaintiff Crabtree's FLSA Retaliation Cause of Action.

In addition to its provisions requiring payment of overtime compensation and minimum wages to nonexempt employees, the FLSA also prohibits retaliation.  In that regard, the Act provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3).  Crabtree maintains that he engaged in protected activity under the FLSA when he complained to Volkert on August 23, 2011 that he was being denied overtime compensation to which he claimed entitlement under the FLSA.  Crabtree further maintains that his discharge on September 2, 2011 was in retaliation for said protected activity.  Defendant moves for summary judgment on this cause of action.

The legal standard by which claims of FLSA retaliation are evaluated on summary judgment is substantively identical to that employed in the Title VII retaliation context.  *See Johnson v. Advertiser Co.*, 778 F. Supp.2d 1270, 1277 (M.D. Ala. 2011) ("In the Eleventh Circuit, retaliation claims under the FLSA are analyzed under the burden-shifting framework employed by courts in cases brought under Title VII of the Civil Rights Act."); *Stephenson v. National Alliance Sec. Agency, Inc.*, 2012 WL 1340073, *7 (N.D. Ala. Apr. 16, 2012) ("where a plaintiff cannot demonstrate direct evidence of retaliation under the FLSA, she may utilize the *McDonnell Douglas* burden shifting framework").  Thus, a plaintiff establishes a *prima facie* case of FLSA retaliation under § 215(a)(3) by establishing three elements: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action."  *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (citation omitted).  "If a plaintiff demonstrates a *prima facie* case, a defendant has the burden of coming forward with a legitimate non-retaliatory reason for [its] adverse employment action."  *Suchite v. Kleppin*, 819 F. Supp.2d 1284, 1293 (S.D. Fla. 2011).  "If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext."  *Wolf*, 200 F.3d at 1343.

For purposes of summary judgment, Volkert does not challenge Crabtree's ability to establish a *prima facie* case of FLSA retaliation.  (Doc. 33, at 27.)[22]  As its legitimate non-

---

[22]    Defendant's acquiescence on this point is prudent, as the record plainly establishes all elements of plaintiff's *prima facie* case.  With respect to protected activity, there
(Continued)

retaliatory reason for terminating Crabtree's employment, defendant initially points to a work slowdown.  Indeed, during this litigation, defendant's officials have consistently explained that Crabtree was laid off for "lack of work."  When asked if Crabtree was terminated for lack of work, David Bell (Volkert vice president involved in the termination decision) responded, "That is absolutely correct."  (Bell Dep., at 100.)  Crabtree's supervisor, Sandy Harmening, testified similarly, indicating that Volkert's "upper management had been asking us to cut our resources because of our lack of work.  I mean, we had more employees than we had work going on." (Harmening Dep., at 131.)  And the "Personnel Termination Form" completed by Volkert for Crabtree recites as the reason for termination "lack of work."  (Doc. 28, Exh. A, at 000791.) There appears to be no genuine factual dispute that Volkert was indeed facing a "lack of work" that reasonably called for a reduction in force in September 2011.

To say that Volkert needed to lay off several employees, however, is not to say why Crabtree (as opposed to other Volkert employees) was selected for layoff just a week after he complained of overtime pay violations.  On that score, defendant offers three explanations, to-wit: (i) Crabtree had been rehired by Volkert in July 2010 for the express purpose of working on the LSU/VA project, which was closing down; (ii) Crabtree was not approved by Volkert's client to perform work on its next contract; and (iii) Crabtree was viewed as disloyal.  (Doc. 33, at 27-32; doc. 39, at 25.)  This articulation of reasons, with supporting record citations, satisfies

---

can be no reasonable debate that Crabtree's conduct on August 23, 2011 (*i.e.*, complaining internally that Volkert's failure to pay him overtime was unlawful) falls within the scope of activity protected by the FLSA's anti-retaliation provision.  *See, e.g., E.E.O.C. v. White and Son Enterprises*, 881 F.2d 1006, 1011 (11th Cir. 1989) ("we conclude that the unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under" the FLSA, because "[t]he anti-retaliation provision of the FLSA was designed to prevent fear of economic retaliation by an employer against an employee who chose to voice such a grievance"); *Keeler v. Florida Dep't of Health*, 2009 WL 1111551, *7 (11th Cir. Apr. 27, 2009) ("Informal complaints are sufficient to trigger this anti-retaliation provision."). Involuntary termination of employment is obviously an adverse employment action.  And the 10-day interval between Crabtree's protected activity and Volkert's termination of his employment suffices to establish the requisite causal connection for purposes of a *prima facie* case.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.").

defendant's modest burden of production in the *McDonnell Douglas* analysis.  Plaintiff does not contend otherwise.

"In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."  *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000).  To show that the stated reason is pretext for unlawful retaliation, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."). Where, as here, a defendant has articulated multiple non-retaliatory justifications for its decision, the plaintiff must rebut each of them to withstand Rule 56 scrutiny.  *See, e.g., Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").  Here, Crabtree has met his burden of casting sufficient doubt on Volkert's stated reasons for selecting him for termination that a reasonable factfinder could deem them unworthy of credence.

First, Volkert contends that Crabtree was chosen in the reduction in force because he was hired for a specific job (the LSU/VA project), and that project was coming to a close.  But plaintiff's evidence is rife with admissions by Volkert that it did not rehire Crabtree exclusively to work on the LSU/VA project and no others; indeed, the record demonstrates that Volkert's intent all along had been to assign Crabtree to work other jobs when the LSU/VA project was completed.  In initial hiring paperwork dated July 2, 2010, Harmening explained the decision to hire Crabtree as follows:  "We are hiring him back to work on the LSU medical center.  His relocation will help on this project ***& future projects***."  (Doc. 28, Exh. A, at 000799 (emphasis added).)  On April 6, 2011, Harmening sent an e-mail to Crabtree stating that, while Volkert had previously been unsure whether "there would be another work assignment for you after the VA/LSU project," it had now been decided that "we are going to work you on the Shreveport project."  (Doc. 37, Exh. O, at P0103.)  Harmening's testimony is crystal clear that Volkert had

intended to assign Crabtree to the Shreveport project when the LSU/VA job was finished. (Harmening Dep., at 132-33.)  In light of this evidence, Volkert's suggestion that Crabtree was let go after the LSU/VA job closed down because he was hired solely for the LSU/VA project is of sufficiently dubious validity that a reasonable factfinder could disbelieve it.

Second, Volkert states that it selected Crabtree for layoff because its client, the Louisiana Department of Transportation ("LDOT"), "would not approve him to work on a major project in Shreveport (Volkert's only ongoing project at the time)."  (Doc. 33, at 28.)  However, a reasonable factfinder could readily deem this statement to be a half-truth lacking in credibility, thereby qualifying as pretext.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (plaintiff may satisfy burden of showing pretext "by showing that [defendant's] proffered reasons are not credible").  It is true enough that LDOT sent letters to Volkert on April 18, 2011 and July 18, 2011 stating that Crabtree was "not approved to provide relocation assistance services" on the Shreveport project.  (Doc. 32, Exhs. 14 & 17.)  It is also true, however, that those same letters included statements by LDOT that "Mr. Brad Joyner is not approved to provide negotiation and acquisition services and improvement control services" and that "Mr. Patrick Anthony is not approved to provide relocation assistance services."  (*Id.*)  Yet Volkert went to bat for Joyner and Anthony (neither of whom had complained of FLSA violations) in September 2011, successfully obtaining LDOT approval for them to work on the Shreveport project based solely on the fact that they had previously received panel acceptance letters.  (Doc. 37, Exh. V, at P0263, P0265-68.)  Crabtree likewise had received just such a panel acceptance letter.  (Doc. 37, Exh. U, at P002197.)  Yet Volkert did not undertake to gain approval for Crabtree, as it did for the non-complainers, Joyner and Anthony.[23]

---

[23]    Defendant ridicules Crabtree's argument as a "Quixotic charge at the windmill" (doc. 39, at 26) and scoffs that, because it did not work to procure approval from LDOT for Joyner and Anthony until mid-September, "it would have been completely illogical for Volkert to have sought such clearance *for an employee it had terminated more than two weeks prior*" (doc. 33, at 31 (emphasis in original)).  This argument misses the point.  As of September 1, 2011, LDOT approval to work the Shreveport project had not been granted to Joyner, Anthony and Crabtree, all of whom possessed the requisite panel acceptance letters.  Volkert chose to fire Crabtree and submit panel acceptance letters for Joyner and Anthony.  It could have laid off one of the others in lieu of Crabtree and submitted Crabtree's letter of approval instead, reaching the same result of approval to work the Shreveport project.  The critical question for purposes of the FLSA retaliation claim is why Volkert fired Crabtree rather than the other two, who had been (Continued)

More importantly, Volkert candidly acknowledged that it could have obtained the requisite LDOT approval for Crabtree to work on the Shreveport project, just as it did for Joyner and Anthony.  Volkert Vice President Bell conceded that Volkert had succeeded in obtaining approval for every Real Estate Specialist or Senior Real Estate Specialist that it had ever wanted to work on an LDOT project.  (Bell Dep., at 117-18.)  And he admitted, "Would we have ultimately probably been able to get Chris [Crabtree] approved for the project; given his background and relocation, yes."  (*Id.* at 118.)  Here, then, is the problem:  Volkert asks this Court to believe that it had "no other choice" but to fire Crabtree because LDOT had not approved him to work the Shreveport project, and Volkert had no other projects.  But the record shows that Volkert could have obtained that approval for Crabtree if it had wished to do so, just as it did for other employees similarly situated to Crabtree who had not engaged in protected activity.  This is exactly the sort of implausibility, incoherency or inconsistency that would allow a reasonable factfinder to deem the stated reason unworthy of credence.

Third, defendant derides Crabtree's "lack of fealty," accuses him of being "disloyal to the company," and asserts that Volkert merely "prioritize[d] the continued employment of those of its workers it viewed as possessing superior qualities of loyalty."  (Doc. 33, at 31; doc. 39, at 26.)  In this regard, Volkert touts a literary quote that if an employer "pays you wages that supply you your bread and butter, work for him – speak well of him, think well of him, stand by him and stand by the institution he represents."  (Doc. 39, at 25 n.6.)  A trio of glaring infirmities doom this argument to failure.  As an initial matter, Volkert identifies no record evidence in which any

---

similarly situated to Crabtree inasmuch as they had been repeatedly rejected by LDOT for the Shreveport project just as Crabtree had been.  That question has not been adequately answered on summary judgment in a manner that negates a reasonable inference of pretext.  Nor does Volkert advance its position on summary judgment by repeatedly pointing to Randy Matheny as an employee who was treated similarly to Crabtree.  A Title VII / FLSA plaintiff has no burden on summary judgment to prove that he was treated differently than every other employee who did not engage in protected activity, only that he was treated differently than some other employee who did not engage in protected activity.  Properly framed, the issue is not why Matheny was treated the same as Crabtree, but why Crabtree was treated differently than employees like Joyner and Anthony, despite the fact that they, like Crabtree, had not been approved by LDOT to work on the Shreveport project as of the date of Crabtree's firing.

decisionmaker ever cited disloyalty as a reason for Volkert laying off Crabtree.[24]  Nor is there
evidence that Volkert viewed other, retained employees as loyal.  Moreover, a reasonable
factfinder could deem the "disloyalty" explanation implausible or lacking in credibility for the
simple reason that Volkert had rehired Crabtree some 14 months earlier with full knowledge of
this purported "disloyalty."  If Volkert truly prized loyalty above other virtues, and harbored a
grudge that Crabtree was disloyal to the company based on events that had occurred five years
earlier, then why did Volkert rehire him in the first place?  Surely a reasonable factfinder could
conclude from this factual disconnect that if fears of disloyalty were not sufficient to prevent
Volkert from rehiring Crabtree, then they also were not the real reason why Volkert fired him.

     Finally, Volkert overlooks the problematic reality that loyalty is a two-edged sword in the
retaliation context.  Was Crabtree deemed disloyal because he resigned his job to make more
money elsewhere in 2006?  Or was he deemed disloyal because he complained of overtime
violations a week before Volkert showed him the door?  The record reasonably supports both
inferences.  If Volkert really did value employees who would "think well of" it and "stand by the
institution," as defendant now insists, then surely a reasonable factfinder could view the
"disloyalty" explanation as mere code for Crabtree's protected activity under the FLSA a week
before he was fired.  After all, what could be more disloyal than accusing the company of
"illegal" activity and talking to other employees about it, as Volkert believed he had done?[25]

---

[24]      To be sure, Bell did testify that Crabtree had "left us to go to work for a
competitor for a little bit more money in the middle of a job" back in 2006.  (Bell Dep., at 146.)
But the cited portions of Bell's deposition do not state that fact as a reason for Crabtree's firing
in September 2011.  Similarly, Harmening did express her opinion that she had "an issue with his
loyalty" because "[h]e left us once.  I mean, I didn't feel no loyalty to that."  (Harmening Dep., at
194.)  But she did not expressly state in her deposition that Crabtree's disloyalty was the reason
(or even a reason) why she recommended him for layoff.  Defendant's counsel appear to be
imputing sentiments to Volkert's managers that the witnesses never expressed, drawing
connections – between feelings of disloyalty and the termination decision – never made by the
witnesses' testimony itself.  This is improper.  *See Odom v. Southeast Supply Header, LLC*, 675
F. Supp.2d 1105, 1110 n.3 (S.D. Ala. 2009) (noting impropriety of counsel including in their
factual recitations certain "facts" not supported by record citations); *Taylor v. Holiday Isle, LLC*,
561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a
summary judgment brief are not a substitute for appropriate record evidence.").

[25]      In particular, Harmening testified that, after Crabtree raised his FLSA overtime
concerns, Volkert "had a meeting with every individual about their status as a Senior Right-of-
Way Specialist or a Right-of-Way Specialist" because Crabtree's "talk was going over into other
(Continued)

By defendant's reckoning, it would appear that loyal company men and women do not speak out when the company fails to pay them what it owes, but instead "stand by" the company come what may.  If, as it now argues, Volkert wanted employees who stood by it and spoke well of it and never worked against it, and if Volkert truly viewed anything else as disloyalty, then Crabtree's protected complaints of illegal denial of overtime compensation might well have placed him in the "disloyal" category in Volkert's eyes.  In that event, of course, his discharge would have constituted unlawful retaliation under the FLSA, with "disloyalty" being a mere euphemism used by the employer to mask retaliatory animus.

For all of the foregoing reasons, the Court finds that Crabtree has successfully rebutted each of Volkert's legitimate non-retaliatory reasons for selecting him (as opposed to other employees) for layoff in September 2011.  On this evidentiary record, taking all reasonable inferences in favor of Crabtree, a reasonable factfinder could conclude that Volkert terminated his employment not because he was only hired for a specific project, he had not received LDOT approval, or he had resigned from the company in 2006, but because Crabtree had accused the company of violating the FLSA's overtime pay requirements barely a week earlier.  Genuine issues of material fact remain for trial; therefore, defendant's Motion for Summary Judgment is **denied** as to the FLSA retaliation cause of action.

**VI.    Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.    Plaintiffs' Motion for Partial Summary Judgment (doc. 28) is **denied**;

2.    Defendant's Motion for Summary Judgment (doc. 32) is **granted in part**, and **denied in part**.  The Motion is **granted** with respect to the salary basis test for the FLSA administrative exemption, and the Court concludes as a matter of law that plaintiffs in fact satisfy the salary basis test pursuant to 29 C.F.R. § 541.603.

---

employees; and they were all concerned."  (Harmening Dep., at 166-67.)  Harmening answered affirmatively when asked if she felt that Crabtree "was spreading his concerns to other employees."  (*Id.* at 167.)  This spreading of overtime concerns by Crabtree might reasonably be viewed as the sort of rabble-rousing, trouble-making "lack of fealty" that led to his immediate ouster by the company.

In all other respects (including whether plaintiffs satisfy the duties test for that exemption, as well as Crabtree's retaliation claim), the Motion is **denied**; and

3.     This matter remains set for Final Pretrial Conference before the undersigned on **January 15, 2013** at **10:00 a.m.**, with trial to follow in the **February 2013** civil term.

DONE and ORDERED this 7th day of December, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE